04-18912.consp-military.ord.wpd

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **CHARLES RUTH, III,** : | |
| : | Case No. 1:04-CV-18912 |
| **Plaintiff,** : | |
| : | JUDGE O'MALLEY |
| v. : | |
| : | <u>MEMORANDUM AND ORDER</u> |
| **A.O. SMITH CORP., et al.,** : | |
| : | |
| **Defendants** : | |

On August 8, 2005, the Court issued a number of oral rulings on the record in this case, with the promise that it would later issue one or more written memoranda confirming those rulings and providing additional explanation. Thereafter, the parties settled. The parties requested, however, that the Court issue the promised written rulings anyway, because the Court's oral rulings had implications for the entire MDL, as well as related actions filed in state court.

Accordingly, this is the first of several memoranda documenting the Court's earlier rulings. For the reasons and to the extent stated on the record earlier, and for the additional reasons stated below: (1) the defendants' motion for summary judgment on Ruth's conspiracy claim (docket no. 66.3) is **GRANTED**; and (2) the defendants' motion for summary judgment based on the government

contractor defense (docket no. 66.2) is **DENIED**.[1, 2]

I.

Plaintiff Charles Ruth, III originally brought this action against a large number of defendants, but eventually dismissed his claims against all but two: Hobart Brothers Company, and ESAB Group, Inc. In his amended complaint, Ruth states four claims against these defendants: (1) conspiracy and fraudulent concealment; (2) negligent misrepresentation; (3) negligent sale of product; and (4) strict liability – sale of unreasonably dangerous product (inadequate warnings and inadequate testing).

On May 2, 2005, the defendants filed a multi-pronged motion for summary judgment (docket no. 66), with several memoranda in support (docket nos. 67-72). One supporting memorandum was directed only at Ruth's conspiracy claim (docket no. 69), and another argued that all of Ruth's claims failed as a matter of law, based on the government contractor defense (docket no. 72). On August 8, 2005, the Court announced, on the record, that the motion for summary judgment on Ruth's conspiracy claim was granted, and explained some of its reasoning. Subsequently, the Court informed the parties, off the record, that the motion for summary judgment based on the government contractor defense would be denied; the Court so informed the parties to allow them to prepare properly for trial, promising to issue a written opinion explaining its reasoning. The Court's analysis of these two issues is set out below.

---

[1] In addition: (1) Ruth's motion to strike Select Arc's statement of interest in support of summary judgment (docket no. 134) is **DENIED**; and (2) Ruth's motion to exclude evidence that defendants acted as government contractors (docket no. 104) is **DENIED**.

[2] Even though this Order documents rulings issued earlier, and even though the *Ruth* case has now settled, for ease of reading the Court phrases this Order in the present tense instead of the past tense, and as if the *Ruth* case was still going to trial.

**A. Conspiracy Count**.

As noted, Ruth's complaint contains four claims. Only the first claim, for "conspiracy and fraudulent concealment," involves an *intentional* tort; the other claims sound in negligence or strict liability. The heart of Ruth's first claim is contained in the following allegation:

> Defendants conspired in pursuance of a common plan or design to commit the following tortious acts:
> a. **fraudulently conceal, misrepresent, and suppress** material scientific and medical information about the toxic effects of manganese in welding fumes;
> b. **deliberately fail to warn** persons in proximity of welding fumes of the known health hazards of manganese in welding fumes;
> c. **deliberately breach their duty to instruct** about proper ventilation, safety equipment, or other precautionary measures, including, but not limited to, a fume extractor device which would protect against the health hazards of manganese in the welding process;
> d. **deliberately breach their duty to investigate** the health hazards of manganese welding; and
> e. sell welding products in a defective condition **without necessary warnings** of the catastrophic health hazards or instructions concerning precautionary measures.

First amended complaint at ¶73 (emphasis added).

In their motion for summary judgment, defendants argue they are entitled to judgment on this claim as a matter of law, for three separate reasons. First, defendants argue that, based on the undisputed facts, Ruth cannot and does not show that Hobart or ESAB entered into *any* relevant agreement with another party, much less an agreement "to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully." *Gallagher Bassett Services, Inc. v. Jeffcoat*, 887 So.2d 777, 786 (Miss. 2004) (quoting *Brown v. Mississippi*, 796 So.2d 223, 226-27 (Miss. 2001)). The absence of proof of an agreement of course, would be fatal to Ruth's conspiracy claim. *See id.* ("persons must agree . . . in order for a conspiracy to exist"). Put simply, the defendants argue there is no evidence upon which a reasonable finder of fact could conclude they ever agreed or conspired

3

to do anything wrong.

Second, defendants argue that, even if they did conspire to conceal facts about the hazards of welding fumes, this conduct could not be a proximate cause of any injury allegedly suffered by Ruth. Defendants assert that, because Ruth ultimately received warnings that were adequate as a matter of law and undisputed fact, these warnings overcame any alleged historical conspiracy aimed at concealing information about the effects of manganese in welding fumes; accordingly, any alleged conspiracy cannot have caused or contributed to Ruth's injuries. Of course, proximate cause is an essential element of Ruth's conspiracy claim, and its absence would entitle defendants to judgment as a matter of law. *See id.* (reversing judgment for plaintiff because "there is not substantial evidence that the conspiracy caused [plaintiff] any damages").

And third, defendants argue that, under Mississippi law, a conspiracy claim cannot succeed when it is premised on a claim for failure to warn. Under this argument, even if the plaintiff can show a conspiracy existed, and even if he can show the conspiracy caused or contributed to his damages, the plaintiff still cannot succeed on a conspiracy theory because Mississippi law does not recognize a claim for conspiracy to fail to warn.

For the reasons explained below, the Court concludes this last argument is well-taken. Because defendants' third argument is sufficient grounds for entry of judgment as a matter of law on Ruth's conspiracy claim, the Court does not reach the other two of defendants' grounds for relief.[3]

**1. Conspiracy and Intentional Tort.**

---

[3] The Court does note, however, that it denied defendants' motion for summary judgment on Ruth's failure to warn claim, because the Court disagreed with defendants that their warnings were adequate as a matter of law and undisputed fact.

4

Ruth and the defendants agree that there is no such thing as a "free-standing claim" for conspiracy – a valid claim must allege that a defendant conspired to engage in wrongful conduct that constitutes, itself, an independent tort. *See Beck v. Prupis*, 529 U.S. 494, 501-02 (2000) ("it [is] widely accepted that a plaintiff [can] bring suit for civil conspiracy only if he ha[s] been injured by an act that was itself tortious"); *Cohen v. Bowdoin*, 288 A.2d 106, 110 (Me. 1972) (conspiracy "fails as the basis for the imposition of civil liability absent the actual commission of some independently recognized tort; and when such separate tort has been committed, it is that tort, and not the fact of [conspiracy], which is the foundation of the civil liability").

The building blocks of defendants' third argument are that, under Mississippi law: (1) the independent tort which is the object of the alleged conspiracy must be an *intentional* tort; (2) the only intentional tort stated in Ruth's complaint is for fraud; and (3) Ruth's fraud claim fails as a matter of law because a valid claim of fraud by a product user against a product manufacturer must allege affirmative misrepresentations, not merely silence or omissions.

Ruth challenges the defendants' assertion that the independent tort supporting a conspiracy claim must be an intentional tort. But the cases Ruth cites do not provide support for his position – they all include allegations of "intentional" or "willful" conduct.[4] In fact, the great majority of

---

[4] Ruth cites *Cipollone v. Liggett Groups, Inc.* 683 F. Supp. 1487, 1499 (D. N.J. 1988) (analyzing plaintiff's claim for "intentional tort/conspiracy"); *In re: North Dakota Personal Injury Asbestos Litig. No. I*, 737 F. Supp. 1087, 1095-96 (N.D. 1990) (the conspiracy claim was premised on the intentional tort of "deceit"); *In re: Kings Cty. Tobacco Litig.*, 723 N.Y.S.2d 304, 307 (N.Y. Sup. Ct. 2000) (the conspiracy claim was premised on the tort of "willful failure to warn").

5

jurisdictions agree that conspiracy claims cannot be founded on the tort of negligence.[5] This conformity exists because conspiracy requires an "agreement," and a person cannot *negligently* agree to something – an agreement can only be reached with intent. Mississippi law conforms with this stance. *Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004) ("[i]t is elementary that a conspiracy requires an agreement between the co-conspirators").

Accordingly, the Court agrees with defendants that the independent tort which is the object of the conspiracy alleged by Ruth must be an *intentional* tort, as a matter of law. In this case, the only intentional tort pleaded by Ruth is fraudulent concealment.

### 2. Affirmative Misrepresentations Versus Silence or Omissions.

When examining the sole intentional tort pleaded by Ruth, it is important to note that every tortious act that defendants allegedly conspired to undertake – as shown by the bold language quoted above from ¶73 of Ruth's complaint — involved an *omission* or *silence*, and not an *affirmative statement*. Indeed, Ruth's own characterization of his claim is that the defendants conspired to engage in "fraudulent *concealment*," not fraudulent *misrepresentation*.

---

[5] *See Belser v. Ammon*, 2005 WL 1395160 at *2 n.4 (Cal. Ct. App. June 14, 2005) ("The law does not recognize a conspiracy to commit negligence. A conspiracy by definition requires intentional agreement to commit or achieve a specific outcome. It is, in other words, an intentional tort. It is a non sequitur to speak of parties intentionally agreeing to fail to exercise due care. The authorities on this point are unanimous."); *Bevan Group v. A-Best Products Co.*, 2004 WL1191713 at *9 (Ohio Ct. Com. Pl. May 17, 2004) ("clearly, negligent undertaking is not an intentional tort," thus "plaintiff's conspiracy claim fails as a matter of law"); *Firestone Steel Products Co.*, 927 S.W.2d 608, 614 (Tex. 1996) ("Given the specific intent requirements, parties cannot engage in a civil conspiracy to be negligent."); *Sonnenreich v. Philip Morris, Inc.*, 929 F. Supp. 416, 419 (S.D. Fla. 1996) ("[l]ogic and case law dictate that a conspiracy to commit negligence is a non-sequitur"); *Senart v. Mobay Chem. Corp.*, 597 F. Supp. 502, 505 (D. Minn. 1984) ("it [is] impossible to conspire to commit negligence").

6

Mississippi courts, however, have consistently held that a claim of fraud may not be based upon an omission or silence, unless there exists a special relationship between the parties. For example, in *Smith v. Tower Loan of Mississippi, Inc.*, 216 F.R.D. 338 (S.D. Miss 2003), the Mississippi Supreme Court explained:

> Preliminarily, it should be noted that the allegations of fraudulent conduct are essentially predicated not on what [defendants'] representatives allegedly affirmatively misrepresented but rather on what defendants allegedly failed to disclose. Yet, "silence, in the absence of a duty to speak, is not actionable."
> "One who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'"

*Smith*, 216 F.R.D. at 358 (citations omitted). Similarly, in *Harris v. Brush Engineered Materials, Inc.* slip op. (S.D. Miss. Feb. 18, 2005) – a case with allegations very similar to those made in this case (*i.e.*, a 50-year conspiracy to hide the dangers of breathing beryllium dust) – the district court dismissed a fraud and conspiracy claim because, "in Mississippi, the mere silence or non-disclosure of material facts by a manufacturer does not support a finding of fraudulent concealment brought by the ultimate consumer." Slip op. at 4.[6] This rule of law suggests that Ruth's fraud claim has no vitality, because it is predicated on the silence and omissions of the defendants.

Ruth tries to reinvigorate his fraud claim with three arguments. First, Ruth argues that, in fact, he was in a special, fiduciary relationship with the defendants. This argument is simply not well-taken on the undisputed facts. Mississippi courts have rejected the argument that fiduciary relationships existed in cases where the parties had direct, substantial, interpersonal contact. *See, e.g., Roman Catholic Diocese of Jackson v. Morrison*, 2005 WL 1039146 (Miss. May 5, 2005)

---

[6] *Harris* is unpublished; it may be found at docket entry no. 69, exhibit 6.

7

(holding that the Roman Catholic Church was not *automatically* in a fiduciary relationship with a parishioner, whose children were allegedly sexually abused by a priest; rather, it depended on the circumstances of the case); *Burgess v. Bankplus*, 830 So.2d 1223 (Miss. 2002) (evidence that plaintiff borrowers had known the defendant bank's president for more than 20 years was insufficient to establish a fiduciary relationship; the closeness of the parties did not move them beyond a mortgagor-mortgagee relationship). The relationship between Ruth and the defendants in this case was simply one of product-user / product-manufacturer. Given that Ruth and the defendants had no direct contact at all, and no agreement existed between them, there is no valid basis for finding – or arguing – that a fiduciary relationship existed between them.

Second, Ruth tries to avoid this rule of Mississippi law by suggesting that other cases have allowed claims for conspiracy and fraud to go forward in similar circumstances. Even ignoring that these cases are all from other jurisdictions, the examples Ruth cites generally involved claims that, in addition to silence and omissions, the defendants made positive, false statements relied upon by the plaintiff. Thus, these cases do not involve similar circumstances. *See, e.g.*, *Cipollone v. Liggett Group, Inc.*, 683 F.Supp. 1487, 1500 (D. N.J. 1988) ("plaintiff has presented evidence from which the jury could conclude that: 1) defendants *made representations* and intentionally concealed facts concerning the state of knowledge concerning the health consequences of smoking; 2) defendants knew of the falsity of these *representations*; * * *") (emphasis added); *Hawkins v. Upjohn Co.*, 890 F. Supp. 609, 611-12 (E.D. Tex. 1994) (plaintiffs alleged they relied on "defendant's representations" regarding the safety of its drug). Except as discussed immediately below, Ruth does not assert he relied upon any misrepresentations by the defendants.

The third argument Ruth advances to avoid summary judgment is to try and recast his claim,

8

asserting the defendants *did* engage in affirmative misrepresentations, in addition to silence and omissions. But the affirmative misrepresentations that Ruth identifies are not of the type that can support a fraud claim. One type of misrepresentation Ruth identifies is historical statements made to industry participants, in trade journals, that welding is safe.[7] But Ruth does not assert the defendants (or their alleged co-conspirators) made these affirmative statements to *him*; and he does not assert he, *himself*, ever read or heard these statements; and he does not assert he *relied* on these statements. While Ruth argues that the effect of these historical statements was to create a lasting false impression, causing industry participants, including his employer, to be less careful than necessary to assure his safety, this effect is too attenuated to suggest any direct reliance on an affirmative misrepresentation made by a defendant.

The second type of affirmative misrepresentation Ruth identifies is the warnings the defendants attached to the welding rods that he used – Ruth asserts these warnings affirmatively misrepresented the safety of welding fumes. Even accepting as true (for the purpose of argument only) that the warnings on the products that Ruth used misrepresented the safety of welding fumes, to adopt Ruth's argument would be to hold that every failure to warn claim was also a fraud claim. As stated in *Burton v. R.J. Reynolds Tobacco Co.*, 397 F.3d 906 (10th Cir. 2005):

> [C]laims that a cigarette manufacturer has not warned of known product dangers are generally not cognizable as fraudulent concealment claims under Kansas law. Rather, they are cognizable as failure to warn claims. To hold otherwise would convert all product manufacturer's duty to warn claims into fraud claims. We do not believe

---

[7] For example, Ruth points to a July 1951 article, "Welding and Cutting Fumes: Health and the Welder," published in *The Welding Engineer*, which stated that, except for lead poisoning, "there is no such thing as a chronic ailment that could be caused by welding." Ruth asserts this affirmative statement is untrue, and defendants and their alleged co-conspirators knew it to be untrue when it was written, because welding can cause the chronic and irreversible illness of manganese-induced parkinsonism.

9

Kansas courts would intend such a result.

*Id.* at 913. This Court is confident that Mississippi courts also would not intend such a result. The affirmative misrepresentations upon which a claim for fraud must be premised cannot include *only* the very warnings that support a product liability claim for failure to warn.

In sum, Ruth has not identified any facts upon which a reasonable jury could conclude that the defendant product manufacturers conspired to engage in fraud, because Ruth has not identified any affirmative misrepresentations made by any alleged conspirators upon which he relied. This is not to say that Ruth cannot proceed against the defendants for their alleged silence and omissions; is it just that he must do so using a failure to warn theory, not a conspiracy or fraud theory. Defendants' motion for summary judgment on Ruth's conspiracy claim must be granted.

Finally, the Court adds two comments regarding this ruling. First, the Court notes that the conclusion it reaches here has implications for the conspiracy claims brought by other plaintiffs against other defendants – including, in particular, defendants GE and Caterpillar, against whom plaintiffs have generally filed *only* claims for conspiracy premised on fraud. While the Court has not yet analyzed the issue, moreover, it is likely the law in other jurisdictions would dictate the same result as to non-Mississippi plaintiffs.

Second, as the Court has made clear elsewhere, the Court's grant of summary judgment on plaintiffs' conspiracy claim does not automatically preclude admissibility of certain documents upon which the plaintiffs have based their conspiracy claim. This is because these documents will sometimes tend to prove other facts at issue in this case, such as the state of defendants' knowledge regarding the hazards of welding fumes, or the degree to which defendants conveyed material information to learned intermediaries.

**B. Government Contractor Defense.**

In their motion for summary judgment, defendants assert they are entitled to judgment as a matter of law on all four of Ruth's claims, based on the government contractor defense. The essence of this defense is that the manufacturing defendants were acting in their role as federal military contractors when they provided the allegedly defective welding rods to Ruth, and acting under federal direction during manufacture; accordingly, they are clothed with the same governmental immunity the government enjoys.

This Court earlier set out some of the legal standards surrounding the government contractor defense (also known as the "military contractor defense") in the context of assessing motions to remand, and incorporates fully that discussion and analysis here. *See In re: Welding Rod Products Liab. Litig.*, 2004 WL 1179454 at *8-13 (N.D. Ohio May 21, 2004) ("*Second Remand Order*," entered at docket no. 224). Some of the discussion set out below is recapitulated from the *Second Remand Order*.

The seminal case setting out the contours of the government contractor defense is *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). The "*Boyle* Court held that, under certain circumstances, government contractors are immune from state tort liability for design defects in military equipment." *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1153 (6th Cir. 1995) ("*Tate I*"). To escape liability under state law for design defects in military equipment on the basis of the military contractor defense, the contractor must establish three conditions: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. These three conditions "serve

11

to ensure that the defense operates to immunize the contractor only where the government has actually participated in discretionary design decisions, either by designing a product itself or approving specifications prepared by the contractor." *Landgraf v. McDonnell Douglas Helicopter Co.*, 993 F.2d 558, 560 (6th Cir. 1993) (quoting *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1316 (11th Cir. 1989), *cert. denied*, 494 U.S. 1030 (1990)).[8]

Federal appellate courts have explained what the government must do before it may be said to have "participated in discretionary design decisions." *Id.* The Sixth Circuit has held that "[t]he government exercises no discretion when it simply approves a design with a rubber stamp, that is, approves a design without scrutiny." *Tate I*, 55 F.3d at 1154 (citing cases). "When the government merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion." *Id.* (quoting *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir.), *cert. denied*, 493 U.S. 935 (1989)). Thus, to determine whether the first condition of the military contractor defense has been satisfied, courts will often examine whether "the government and the contractor engage[d] in a continuous back and forth review process regarding the design in question." *Id.* (internal quotation marks and citation omitted).

In *Tate v. Boeing Helicopters*, 140 F.3d 654 (6th Cir. 1998) ("*Tate II*"), the Sixth Circuit explained in more detail when the government has exercised its discretion in the context of a claim for failure to warn:

---

[8] As noted in the *Second Remand Order*, the Sixth Circuit Court of Appeals set out a modified *Boyle* test for whether the military contractor defense will prevail in a failure-to-warn case, as compared with a design defect case. *See Second Remand Order,* 2004 WL 1179454 at *10 (quoting *Tate I*, 55 F.3d at 1156-57).

> [D]iscretion occurs where the government is both knowledgeable and concerned about the contents of the proposed warnings before granting its approval. The government is sufficiently knowledgeable when it has a complete enough understanding of the proposed warnings to reasonably recognize which hazards have been thoroughly addressed and which have not. The government is sufficiently concerned when it demonstrates a willingness to remedy or require the remedy of any inadequacies it finds in the proposed warnings. Where government knowledge and concern are exhibited through the review process, it may be fairly said that the government has decided which warnings should and should not be provided to end users.

*Tate II*, 140 F.3d at 658.

Critically, to prevail on the military contractor defense, it is the defendants who have to show that the government *did* exercise its discretion – the plaintiffs do not have to show the government did *not* exercise its discretion. The defendants "bear[] the burden of proving each element of the government contractor defense." *Beaver Valley Power Co. v. National Engineering & Contracting Co.*, 883 F.2d 1210, 1217 n.7 (3rd Cir. 1989) (citation omitted). "[O]n summary judgment[,] this means that [defendants], as the party-movant[s] that bear[] the ultimate burden of persuasion at trial, must establish that there is no genuine issue of material fact as to every element of the defense." *Id.* Further, the question of whether the military contractor defense prevails in a given case is a question of fact. *Trevino*, 865 F.2d at 1480 (the "trier of fact should not evaluate the wisdom or quality of any government decision, but must locate the actual exercise of the discretionary function"); *Beaver Valley*, 883 F.2d at 1217 (the inquiry regarding whether "the government actually considered the particular specification" is "a factual one, and conclusions will, of course, vary greatly according to

the circumstances").[9] Ultimately, then, unless reasonable minds could not disagree, "whether the facts establish the conditions for the [military contractor] defense is a question for the jury." *Boyle*, 487 U.S. at 514.

In this case, the defendants argue that no reasonable juror could fail to find the existence of all elements of the military contractor defense, including that the government used its discretion to decide "which warnings should and should not be provided to end users." *Tate II*, 140 F.3d at 658. After reviewing the parties' recitations of the evidence, however, the Court concludes that there remain material issues of disputed fact, making entry of summary judgment inappropriate. While defendants make a strong showing on a number of issues, and enjoy the benefit of relatively lenient case law in this Circuit,[10] it appears to the Court that – based on the current record – reasonable jurors could find in favor of either the plaintiffs *or* the defendants with respect to the level of discretion exercised by the Navy in the formulation and approval of the relevant warnings, and also on the question of whether the defendants warned the Navy of information in their possession about which the Navy was unaware. While the Court reserves its right to reassess the defendants' arguments after all of the evidence is presented at trial and, if appropriate, to enter judgment in favor of the defendants on all claims pursuant to Fed. R. Civ. P. 50, the Court concludes that it cannot enter

---

[9] Although *Beaver Valley* post-dates *Boyle*, it does not cite *Boyle*, and the conditions set out in *Beaver Valley* for when the military contractor defense will prevail appear more stringent than those set out in *Boyle* and *Tate I*. *See Beaver Valley*, 883 F.2d at 1216 (requiring, among other things, that "the government knew as much or more than the defendant contractor about the hazards of the project or product"). Nonetheless, *Beaver Valley* remains good law in support of the unremarkable evidentiary propositions for which the Court cites it, above.

[10] *See Tate I*, 55 F.3d *at* 1157 ("some of the cases decided in other circuits applying the government contractor defense to failure to warn claims may require a higher level of government involvement than we think is required").

14

judgment in favor of defendants at this juncture, pursuant to Fed. R. Civ. P. 56.

Finally, the Court adds it does *not* agree with Ruth's argument that, because he did not weld on Navy ships, the military contractor defense cannot possibly apply. Ruth notes that virtually all of the welding he did was on *commercial* ships known as Offshore Supply Vessels ("OSVs"), and not on *military* vessels; accordingly, he argues, the military contractor defense simply does not apply. *See* response brief at 3 ("because the central prerequisite upon which the government contractor defense is based – the Plaintiff doing military work and getting sick from that military work – is not present here, this defense does not apply to Plaintiff's claims"). Ruth cites no cases to support his argument, however, while the defendants cite several cases to the contrary.[11] It is beyond dispute that all of the welding rods Ruth used at the Ingalls Shipyard satisfied the Military Specifications ("MilSpecs") that the Navy set for those items. Whether Ruth used these MilSpec welding rods on

---

[11] *See, e.g., Glassco v. Miller Equip. Co.*, 966 F.2d 641 (11th Cir. 1992) (civilian who bought allegedly defective military surplus lineman's belt was precluded from recovery for product defect by the military contractor defense, although his claim that the manufacturer failed to adequately warn the government and users of the belt was allowed to go forward); *Skyline Air Serv., Inc. v. G.L. Capps Co.*, 916 F.2d 977 (5th Cir. 1990) (military contractor was immune from liability for injuries stemming from the crash of a military surplus helicopter being used for commercial logging operations); *Timberline Air Serv., Inc. v. Bell Helicopter-Texton, Inc.*, 884 P.2d 920, 929 (Wash. 1999) (same result as *Skyline*, stating: "[t]he same policy considerations identified in *Boyle* apply whether the product remains in military use or ultimately ends up in civilian hands," but further holding that the "government contractor's defense does not preclude a legitimate post-manufacture *failure-to-warn claim* where the only compliance with any government contract specifications is with *design specifications*") (emphasis added); *Jackson v. Deft, Inc.*, 223 Cal. App.3d 1305, (Cal. Ct. App. 1990) (holding that, "if a product is produced according to military specifications and used by the military because of particular qualities which serve a military purpose, and is incidentally sold commercially as well, that product may nonetheless still qualify as military equipment under the military contractor defense;" but denying summary judgment based on the military contractor defense, because there existed issues of disputed fact regarding warnings: "Although defendants' evidence did show that certain warnings were required by the military specifications, that evidence did not establish that the specifications placed any limitation on additional information from the manufacturers to users of their products.").

military or civilian vessels is irrelevant to the question of whether the military contractor defense applies.

For these reasons, the defendants' motion for summary judgment based on the military contractor defense must be denied.

**IT IS SO ORDERED.**

                                        **s/Kathleen M. O'Malley**
                                        **KATHLEEN McDONALD O'MALLEY**
                                        **UNITED STATES DISTRICT JUDGE**

**DATED:** October 11, 2005