04cv18912d-ord(various-rulings).wpd

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES RUTH, III, | : | |
| | : | **Case No. 1:04-CV-18912** |
| Plaintiff, | : | |
| | : | **JUDGE O'MALLEY** |
| v. | : | |
| | : | **MEMORANDUM AND ORDER** |
| A.O. SMITH CORP., et al., | : | |
| | : | |
| Defendants | : | |

The Court earlier issued a number of oral rulings on the record in this case,[1] with the promise that it would later issue one or more written memoranda confirming those rulings and, in some cases, providing additional explanation.  Thereafter, the parties settled this case.  The parties requested, however, that the Court issue the promised written rulings anyway, because the Court's oral rulings had implications for the entire MDL, as well as related actions filed in state court.

Accordingly, this is one of several memoranda documenting the Court's earlier rulings.[2]  For the

---

[1]  *See, e.g.*, hearing transcript at 42-142 (Aug. 8, 2005); hearing transcript at 33-64 (August 30, 2005).  The Court issued rulings on motions pending in both this specific case, and also on motions aimed at all MDL cases pending on the master docket.

[2]  The Court earlier issued a written memorandum confirming its oral rulings on defendants' motion for summary judgment on Ruth's conspiracy claim and defendants' motion for summary judgment based on the government contractor defense.  *See Ruth* docket no. 180.  In a future Order, the Court will confirm in writing its rulings regarding Ruth's motion to exclude evidence regarding allocation of alleged fault on the part of Ingalls Shipyard (*Ruth* docket nos. 105 & 115).

reasons and to the extent stated on the record earlier, and for the additional reasons stated below,[3] the

Court hereby documents the following rulings.[4]

•       **Defendants' Motion for Summary Judgment on Ruth's Failure to Warn Claim (*Ruth docket no. 66.1*).**

Defendants move for summary judgment on Ruth's failure to warn claim, asserting that the

warnings they placed on the welding rods at issue were adequate as a matter of law.  For the reasons

stated on the record and the additional reasons stated below, this motion is **DENIED**.

The warning labels on the Hobart and ESAB welding rods that Ruth used do contain warnings

regarding welding fumes.  For example, both the Hobart and ESAB warning labels tell the welder to

"keep your head out of the fumes," and to "use enough ventilation, exhaust at the arc, or both, to keep

fumes and gases from your breathing zone and the general area."  The Hobart label goes further, stating:

"the following chemicals and their oxides may be hazardous during welding: * * *, manganese, * * *.

Lung, nervous system, and allergic skin reaction may result from overexposure."  In contrast, the ESAB

label does not mention manganese, nor does it mention anything about nervous system injury.

The Hobart and ESAB warning labels also each directed Ruth to read the Material Safety Data

Sheets ("MSDSs") that accompanied the welding rods which Hobart and ESAB sent to Ruth's employer,

Ingalls Shipyard.  Among other things, the Hobart MSDS warned that "Long-term overexposure to

---

[3] To the extent the parties intend to rely on these rulings in other MDL cases, the Court notes that this opinion and the hearing transcripts of the Court's oral rulings should be read together; neither, alone, contain all of the reasons behind the Court's rulings.

[4] Even though this Order documents rulings issued earlier, and even though the *Ruth* case has now settled, for ease of reading the Court phrases this Order in the present tense instead of the past tense, and as if the *Ruth* case was still going to trial.

manganese compounds may affect the central nervous system.  Symptoms may be similar to Parkinson's disease and can include slowness, changes in handwriting, gait impairment, muscle spasms and cramps, and less commonly, tremor and behavioral changes."  The ESAB MSDS, again less thorough, simply warned that "Overexposure to manganese compounds may affect the central nervous system, symptoms of which are languor, sleepiness, muscular weakness, emotional disturbances, and spastic gait."

Under Mississippi law, which applies in this case, a product warning is legally adequate if it "communicates sufficient information of the dangers and safe use of the product."  Miss. Code Ann. 11-1-63.  Defendants insist the warnings they provided to Ruth are adequate as a matter of law, because the warnings: (1) specifically addressed the danger that manganese can cause neurological damage, and (2) specifically explained that safe use of welding rods included avoiding the inhalation of welding fumes.

The Court concludes, however, that there exist genuine issues of material fact regarding whether the warnings provided by both Hobart and ESAB in this case are legally adequate.[5]  These issues of material fact allow a reasonable jury to find in favor of Ruth on his failure to warn claim.  Among other reasons, the Court reaches this conclusion because it appears, on the evidence so far adduced, that a jury could reasonably conclude that: (1) the MSDSs do not "communicate sufficient information" that the danger of exposure to manganese comes from exposure to welding *fumes*, and not just the welding rod itself; (2) the warnings do not explain that welding fumes contain a substantially higher percentage of manganese than do the welding rods; (3) the warning to "use enough ventilation . . . to keep fumes and gases from your breathing zone" does not "communicate sufficient information" to inform a welder how to use the welding rod safely, because "enough ventilation" is not defined; (4) the warnings did not

_____

[5]  Of course, given that ESAB's warnings were less specific than Hobart's warnings, this ruling applies even more strongly to ESAB.

sufficiently communicate the level and extent of the danger of inhaling welding fumes; (5) the warnings' use of a reference to a separate document – the MSDSs – did not serve as a sufficient mechanism to adequately and actually give notice to the intended warning recipient; and/or (5) the warnings given were inadequate in light of the defendants' history of having earlier provided welders with what a jury could conclude were grossly inadequate and possibly even misleading warnings.[6]

Further, the Court cannot conclude that, as a matter of law, Ruth's failure to warn claim is barred by the learned intermediary doctrine. Defendants assert they sufficiently discharged their duty to warn by "relying on intermediaries to warn end-users of the hazards associated with [their] products." Memo in support at 30. Specifically, defendants state they "adequately warned [Ruth's employer, Ingalls Shipyard], through their warning labels and MSDSs, of the potential risks of manganese overexposure, and the precautionary measures to be taken during the welding process to prevent such exposure." *Id.* at 32. Given the present state of the record, however, the Court finds a reasonable jury could conclude that defendants had certain knowledge regarding the extent of welding fume hazards and how to avoid those hazards, but defendants did not *fully* disclose this information to Ingalls Shipyard. Thus, Ingalls

---

[6] With regard to this last point, Mississippi law states that "[a]n adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, *taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product*." Miss. Code Ann. §11-1-63(c)(ii) (emphasis added). The "ordinary knowledge common to an ordinary [welder]" regarding the danger of welding fumes must be measured, at least in part, by the information and warnings given by the defendants to welders historically. On the evidence so far adduced, a jury could reasonably conclude that a modern warning by a defendant to a welder was inadequate because it did not sufficiently take into account "ordinary knowledge," where the defendants' historical dissemination of public information underlying that knowledge was, for many years, inadequate or misleading. Put differently, if published in a void, a manufacturer's warning that it is dangerous to use a product in a certain way might be adequate; but a jury could reasonably conclude the same warning is *inadequate*, if published after many years of statements by the manufacturer that using the product in that way is *not* dangerous.

may not have been completely "learned" regarding the known hazards of welding, and so could not adequately warn Ruth. *See, e.g., In re: Norplant Contraceptive Prod. Liab. Litig.*, 215 F. Supp.2d 795, 803 (E.D. Tex. 2002) ("[w]hen the warning to the intermediary is inadequate or misleading, however, the manufacturer remains liable for injuries sustained by the ultimate user").  Because a reasonable jury could conclude the defendants' warnings did not "communicate[] sufficient information of the dangers and safe use of the product" to Ingalls, the motion for summary judgment on Ruth's failure to warn claim, based on the learned intermediary defense, must also be denied.


•    **Defendants' Motion for Summary Judgment on Ruth's Claim for Punitive Damages (*Ruth* docket no. 66.6).**

The Court finds that, on the current record, it cannot conclude as a matter of law that no reasonable jury could find Ruth is entitled to punitive damages.  Plaintiffs point to evidence that could allow a jury to conclude that, as of the date of Ruth's injury, defendants had access to information indicating that welding fumes posed health hazards for their workers, but defendants failed to take adequate steps to warn of or guard against those hazards, and may have participated in affirmatively hiding or downplaying the extent of those hazards.  If accepted by a jury and left unrebutted, such evidence could support an award of punitive damages.  Accordingly, this motion is **DENIED**.  This denial, however, is without prejudice, meaning defendants may later move for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50, on Ruth's claim for punitive damages.  The Court notes the following aspects of its ruling on this issue: (1) it is generally preferable to wait until after all the evidence is in before addressing the legal sufficiency of a punitive damages claim, where one is authorized by law; accordingly, this Court normally will grant a summary judgment motion on this issue only in compelling

circumstances not present in this case; and (2) as explained elsewhere,[7] the Court has determined that much of the evidence that would support a claim for punitive damages is also relevant and admissible for other purposes, so it is appropriate to allow the testimony to proceed and to make a determination later whether there will be a punitive damages charge to the jury.

• **Ruth's Motion to Exclude Testimony by Experts Thomas and Schimmel (*Ruth* docket no. 91)**
• **Ruth's Motion to Bar Evidence of Lawyer Advertising (*Ruth* docket no. 94).**
• **Defendants' Motion to Exclude Evidence of Claims Brought by Other Welders after August 2000 (*Ruth* docket no. 106.1)**

These motions are all **GRANTED**.  Ruth stopped welding in August of 2000.  Defendants concede that claims similar to Ruth's that were brought by other welders *before* this date may have some limited relevance regarding defendants' notice and knowledge of the health effects of welding; but defendants argue that lawsuits filed *after* this date are irrelevant, because they cannot possibly show defendants' notice or knowledge as of the time Ruth was doing any welding.  The plaintiffs respond that, even if not relevant to defendants' knowledge as of the date warnings were given, the spate of lawsuits now pending against the defendants is relevant to rebut defendants' current and continued assertion that there is simply *no* causal connection between exposure to welding fumes and the onset of neurological injury.

---

[7] *See generally* hearing transcript (Aug. 10, 2005); hearing transcript (Sept. 2, 2005); and *see* hearing transcript (Aug. 8, 2005) at 94-95 ("I'm not guaranteeing that I'm going to charge the jury on punitive damages, but I am going to withhold judgment on the issue at this point.  In other words, I'm going to make that decision at the close of all of the evidence.  Except in extreme cases, I rarely deal with punitive damages in the summary judgment context, and here because I find that the evidence that would support the punitive damages argument is relevant for other purposes, it makes sense to allow the testimony to proceed and to make a determination before I charge the jury whether there will be a punitive damages charge.").

Separately, defendants assert that, if their motion to exclude evidence of lawsuits brought by other welders is overruled, they intend to introduce expert testimony showing that all of the recent welding lawsuits came in the wake of huge lawyer advertising.  Defendants offer as experts Randall Thomas, who is a Mississippi psychologist, and Kurt Schimmel, who is a business professor and "advertising expert;" they both opine that the dramatic increase in welders' lawsuits is attributable mostly to advertising by plaintiffs' counsel, and not, for example, because welders generally got poor diagnostic health care before 2000.  Plaintiffs respond by moving to exclude this evidence as inadmissible under both *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Fed. R. Evid. 403.

The Court need not fully reach the *Daubert* issues raised by plaintiffs, because the Court concludes the evidence of lawsuits brought by other welders must be excluded pursuant to both Fed. R. Civ. P. 403 and 611(a)(2).  While plaintiffs are correct that a multiplicity of injury claims by welders is inconsistent with the notion that no harm can flow from exposure to welding fumes, defendants are also correct that the spark leading to the great number of recently-filed lawsuits is the combination of the advertising and screening processes used by plaintiffs' counsel to identify potential claimants.  As defendants point out, moreover, the validity of the claims asserted in those cases remains untested. Given the complicated issues in this case, a jury's time would not be well-spent sifting through expert opinions regarding the efficacy of lawyer advertising, and debating the viability of thousands of lawsuits that are not before it.  The Court, accordingly, finds that it is necessary and appropriate to exclude both types of evidence, as a matter of prudent trial management.

The Court adds the following caveat, however, so that the scope of this ruling is not misunderstood.  The Court excludes reference to *lawsuits*, and evidence analyzing the arguable driving force behind those lawsuits having been filed.  This ruling does not pertain to claims for disability filed

7

by a welder directly with one of the MDL defendants, or with any employee benefit plan sponsored by or in any way affiliated with an MDL defendant. Those types of claims, and their allowance *vel non*, are generally not the product of lawyer advertising and may, indeed, be relevant to the credibility of a defendants' current disavowal of having reason to know of any connection between welding and neurological injury. Issues relating to these types of claims for benefits are not currently ripe and are not addressed by this ruling.

• **Ruth's motion to exclude testimony from expert Krenek (*Ruth* docket no. 92).**

In an earlier Order, the Court noted it would apply the same general limitations to defendants' warnings expert, Dr. Richard Krenek, as it would to plaintiffs' warnings expert, Robert Cunitz. *See* docket no. 1353 at 12-17. Thereafter, Krenek filed a supplemental, *Ruth*-specific expert report, and plaintiffs moved to exclude Krenek's testimony. This motion is **GRANTED IN PART**; as earlier stated, the Court will limit Krenek's testimony in generally the same manner as it will limit Cunitz's testimony, including exclusion of any "ultimate opinion" testimony. The Court cannot be more precise in the abstract, and will rule on any other objections on a question-by-question basis.[8]

• **Ruth's Motion to Bar Admission of Lincoln's Warning Labels (*Ruth* docket no. 93).**

This motion is **CONDITIONALLY DENIED**. Ruth asserts he never saw any Lincoln warning labels – he saw only Hobart and/or ESAB warning labels – so defendants should not be allowed to introduce any Lincoln warning labels at trial because they are irrelevant. Among other arguments,

---

[8] The Court addresses Krenek's opinions about about Ingalls' Hazard Communications Program below, in its discussion of Ruth's motion to exclude evidence re: employers' HazCom duties (*Ruth* docket no. 164).

defendants respond by noting they have asserted the learned intermediary defense, and any pertinent information received *from any source* by the Ingalls Shipyard is relevant to show what Ingalls knew and what it passed on to Ruth.  Indeed, defendants argue that the pertinent information received by Ingalls includes not only Lincoln warning labels but also various Lincoln publications on welding safety. Generally, the Lincoln warnings defendants seek to introduce are stronger than the Hobart and ESAB warnings.

The Court concludes that these Lincoln materials may be admitted, to the extent, and *only* to the extent, that defendants can first establish through testimony of Ingalls representatives that: (1) the particular warnings were actually received from Lincoln; and (2) the Lincoln warnings educated and informed Ingalls in a particular, meaningful way that was in addition to any education and information provided by Hobart's and ESAB's warnings.  A Lincoln warning would also be admissible if the evidence shows that Ingalls actually took action which was based specifically upon the additional education and information obtained from the Lincoln warning.

Thus, defendants may not show to the jury any Lincoln warning unless and until defendants have shown the warning was a substantial and specific basis for Ingalls' understanding of the dangers from welding fumes.  In addition, Ruth may still testify (and his counsel may argue) that: (1) Ruth never saw the Lincoln warning labels; (2) the Lincoln warnings also remain inadequate to fully educate Ingalls of the hazards of welding fumes; (3) Ingalls did not pass on to Ruth what the Lincoln warnings said; and/or (4) defendants should have known Ingalls would or could not pass on the information contained in Lincoln's warnings.  Any party may request a limiting instruction as to point (1) above, given the limited purpose for which evidence of the Lincoln warnings may be proffered.

9

- **Ruth's Motion to Exclude Reference to Cunitz's Disqualification in Unrelated Cases (*Ruth* docket no. 95).**

    In at least four other cases, courts have ruled that Ruth's warnings expert, Dr. Cunitz, was not qualified to offer testimony.  Ruth asks that evidence of these other disqualifications be excluded as irrelevant.  This motion is **GRANTED**.  The only relevant question is whether Cunitz is qualified to opine in *this* case, and the Court has answered that question affirmatively (though with limitations).  Especially given the particular bases for the rulings in those other cases, any attempt by defendants to delve into Cunitz's disqualifications in other proceedings would confuse the jury, cause Ruth undue prejudice, and have the effect of undermining the rulings of this Court.

- **Ruth's Motion to Bar Certain Psychological Evidence (*Ruth* docket no. 96).**

    For the reasons stated on the record, this motion is **GRANTED IN PART**.  Given that Ruth claims his exposure to welding fumes caused neuro-psychological harm and emotional distress, the Court will allow introduction of some of the evidence addressed in this motion, to be strictly circumscribed by Fed. R. Civ. P. 403.

- **Ruth's Motion to Bar Evidence of Previously Named Defendants (*Ruth* docket no. 97).**

    Defendants argue that Ruth's originally having named defendants other than Hobart and ESAB, and then dismissing them, is relevant and admissible to show Ruth's awareness of warnings issued by these other welding rod manufacturers.  Defendants go so far as to state that Ruth's allegations, in his original complaint, are tantamount to admissions that Ruth had read these other manufacturers' warnings.  The Court disagrees, and Ruth's motion is **GRANTED**.  The fact that Ruth named certain defendants and then dismissed them after discovery  is not an admission and is not relevant to any issue in this case.

10

- **Ruth's Motion to Exclude Evidence of Flying on Private Airplanes (*Ruth* docket no. 98).**

    Various fact and expert witnesses have used plaintiffs' counsel's private airplanes to attend depositions, hearings, medical appointments, and so on. Ruth seeks to preclude defendants from bringing out this information at trial, while defendants argue it is legitimate evidence of bias, in the same way as is evidence of an expert's hourly rates. The Court concludes the "private airplane" evidence is too attenuated to show bias, so the motion is **GRANTED**. Any impeachment on the basis of bias due to financial interests may be undertaken sufficiently by adducing evidence of how much a witness got paid, how often they have worked for a particular party (or type of party), and the extent to which their expenses were covered or reimbursed. Federal Rules of Evidence 403 and 611 counsel against delving into greater detail regarding which hotels experts use,  in what restaurants they ate, whether they fly first class, and so on. This limitation will be applied equally to all parties.

- **Ruth's Motion to Exclude Evidence of Collateral Sources (*Ruth* docket no. 99).**

    Ruth qualifies as an "employee" under the federal Longshore and Harbor Workers Compensation Act ("LHWCA" or "Act"). Accordingly, Ingalls Shipyard made a workers' compensation claim on Ruth's behalf under the Act.[9] Ruth has not received "compensation" under the Act, but he has received certain medical benefits. Ruth asserts these benefits qualify as collateral sources under Mississippi law and are not admissible as evidence: "[c]ompensation or indemnity for the loss received by the plaintiff from a collateral source, wholly independent of the wrongdoer, as from insurance, can not be set up by the [defendant] in mitigation or reduction of damages." *Busick v. St. John*, 856 So.2d 304, 309 (Miss.

---

[9] LHWCA is basically a federal workers compensation law that applies to persons working on ships located on or near navigable waters.

2003).

Defendants generally agree they cannot use collateral source evidence to show damage mitigation.  But defendants argue that, for other reasons, they should be permitted to make reference to federal or state "health benefit programs" or "collateral sources," so long as these references are not connected with the payment of benefits to Ruth.  In particular, defendants note that: (1) Ingalls Shipyard is the largest employer in Mississippi and has employed tens of thousands of welders over the years; and (2) Ingalls' Risk Manager, Steve Pierce, testified at a 30(b)(6) deposition that, other than Ruth, no worker has made a LHWCA or related claim against Ingalls for neurological impairment as a result of welding in the past 64 years.  Defendants want to adduce this evidence to show that, despite the exposure of tens of thousands of other welders to welding fumes, none has suffered an injury similar to Ruth's.

The Court concludes the motion must be **GRANTED in part**, to the extent that no witness may refer to LHWCA or any similar benefits program, or to Ruth's having received LHWCA or similar benefits.  However, the Court will allow Pierce to testify that he reviewed "medical claims" made by Ingalls Shipyard welders over the last 64 years and he has no knowledge of any claim ever being made by any welder for neurological impairment.  The parties stated they will work out a stipulation that addresses their concerns.


•    **Ruth's Motion to Bar Testimony Regarding PET Scans (*Ruth* docket no. 100).**

The Court earlier denied a *Daubert* motion filed by plaintiffs, on the master docket, seeking to strike or limit testimony relating to PET scans (MDL docket no. 964).  The question remained, however, whether the defendants would be permitted to ask Ruth himself, at trial, about his reasons for choosing not to undergo a PET scan.  The Court concludes that this line of questioning, when directed at a person

12

who is not a learned professional or sufficiently educated regarding the science behind (or risks and benefits of) a PET scan, would be confusing and unfair.  Accordingly, this motion is **DENIED**, pursuant to Rule 403.  Defendants may, of course, establish that Ruth has not undergone a PET scan, but they may not address his willingness *vel non* to have one.[10]

• **Ruth's motion to exclude certain testimony of Zimmerman (*Ruth* docket no. 101).**

Plaintiffs named Dr. Neil Zimmerman as an "MDL core expert" on industrial hygiene – not on warnings – but they do not intend to call Zimmerman at the *Ruth* trial.  When defendants asked Zimmerman at deposition whether "warnings on welding consumables were adequate in the 1990s," Zimmerman opined "they were adequate."  Zimmerman also wrote in his declaration that welders were not adequately warned "until the 1990s."  Defendants argue this testimony is admissible because it is relevant, qualifies as an admission, and also may come in for "any purpose" under Rule 32(a)(3)(B).

Ruth insists the testimony is irrelevant because Zimmerman was not opining particularly about the Hobart and ESAB warnings at issue in this case.  Further, Ruth points to Zimmerman's full testimony, where he: (1) explains that each label has to be examined individually to see when it "is getting to be adequate;" and (2) seems to suggest there is a difference between adequately disclosing a hazard as required by law, and adequately warning a welder of generic or general hazards.  Ruth also argues there is no rule or policy that a defendant can introduce testimony of an MDL core expert in a given case, if that particular plaintiff does not intend to call him as a witness.  Ruth contends, moreover, that this is especially true where the substance of the testimony to be elicited falls outside the subject area

---

[10]  After the Court issued this ruling, Ruth did undergo a PET scan.  Nonetheless, the Court intends to apply the same reasoning to other cases in this MDL, absent good reason to reconsider its position.

for which the expert was designated.

The Court agrees with defendants' general proposition that an opponent's expert's testimony may be admissible as an admission, even if the opponent does not actually call the expert.  And the Court further agrees with defendants that it has the discretion to admit Zimmerman's statements.  Finally, the Court agrees that plaintiffs' counsel sufficiently designated Zimmerman as an expert who might be called in *Ruth*, so that his testimony would be admissible in *Ruth*, even if Ruth does not actually call him as a witness.

The Court does not, however, believe Zimmerman made a clear admission that is admissible in *Ruth*, for the following reasons.  With regard to the *Ruth* defendants, Zimmerman was not shown any Hobart documents, only ESAB documents, and his "admission" goes only to an ESAB MSDS, not to a warning label.  As to this document, he stated that it is generally "adequate," but only after giving lengthy and somewhat complicated testimony defining what this term means to him.  Critically, his definition of 'adequate" is different than the legal terminology and standard that would be included in a jury instruction on when and whether a warning is legally sufficient.

Ultimately, for Zimmerman's "admission" to be allowed into evidence at the *Ruth* trial at all, it would have to be accompanied by Zimmerman's explanation, as well.  The sum of Zimmerman's testimony, then, would be unduly confusing to a jury, carry very little probative value to the defendants' case, and, in the end, carry no clear "admission."  Further, admitting this testimony and any rebuttal would take a fair amount of time.  Given that each party has other witnesses to testify about the particular warnings at issue, and pursuant to Fed. R. Civ. P. Rules 611 and 403, the Court concludes the motion *in limine* must be **GRANTED**.

The Court adds, however, that this ruling applies only to these defendants (Hobart and ESAB).

Zimmerman's discussion of warnings issued by other defendants (e.g., Lincoln) goes beyond his discussion of the ESAB MSDS – that is, as to other warnings, he goes beyond merely stating they are "adequate," as he defines that term – so other statements he made *may* be admissible in a different case.[11]

- **Ruth's Motion to Bar Evidence of Other Possible Causes of His Injury (*Ruth* docket no. 102).**

With this motion, Ruth states he "anticipates that Defendants will attempt to submit evidence of possible other causes of [his neurological injury], specifically evidence regarding poisoned well water, genetics, Gulf War syndrome, and carbon monoxide exposure."  Ruth also suggests defendants will point at the primer that was painted on some of the steel he welded, and even to his having repeatedly showered in manganese-containing water, as possible toxins that caused his injury.  Ruth argues none of this evidence should be allowed because there is no basis (and no expert opinion) to show any of these agents can cause his particular set of symptoms or disease.

In response to Court questioning, defendants explained they intend only to adduce evidence of "other sources of manganese in [Ruth's] work environment." Tr. at 40-41 (Aug. 30, 2005).[12]  Defendants explain that their industrial hygienist, Daniel Chute, can testify regarding various common activities that

---

[11] While the Court certainly understands why defendants would want to introduce the statement of an expert hired by *plaintiffs* that a defendant's warning sufficiently apprised a welder of the dangers from welding and welding fumes, the value to defendants of such evidence is only as good as the clarity of the admission.  The clarity of Zimmerman's statements regarding various warnings varies substantially.

[12] This explanation was somewhat different from the one contained in defendants' response brief, which suggested defendants wanted to point to a broader array of toxins than just other sources of manganese in the workplace.  As the Court noted at the hearing, however, defendants had no evidentiary basis (expert opinion or otherwise) upon which to base the assertion that many of these other toxins could cause the symptoms and injury suffered by Ruth.

occur in the Ingalls Shipyard (such as metal-grinding, -cutting, -blasting, and painting) that yield exposure to manganese.

The Court concludes that, based on defendants' representations of what they intend to adduce, the motion must be **DENIED**; however, the Court adds the following caveats.  Chute may testify that a given activity takes place at Ingalls Shipyard and is a source of manganese exposure, but only if the defendants first lay a foundation that, in fact, Ruth could have been exposed to that particular activity or source of manganese.  Chute may, if appropriate, also testify that there exist governmental or other regulations regarding manganese exposure limits with respect to these other activities.  Finally, Chute may *not* testify or opine that any of these activities did or can cause neurological injury, as he is not qualified to do so; his testimony must be limited to the possibility of manganese exposure from these other sources, and not the possible effects of such exposure.  Plaintiffs are also free, of course, to cross-examine Chute regarding his inability to causally link the exposures he identifies to the type of neurological injury claimed.


•    **Ruth's Motion to Exclude Evidence of Negative Economic Impact (*Ruth* docket no. 103)**.

Ruth moves to exclude evidence that a punitive damages award would cause defendants to suffer certain negative economic impacts, such as higher insurance premiums and having to lay off workers. Beyond the fact that any such effect (or at least the degree) is uncertain and unpredictable, Ruth asserts such evidence is unduly prejudicial and immaterial to an award of punitive damages.  Defendants respond that a jury is charged with considering the "economic effects" of an award of punitive damages when determining the proper amount, and that the possibility of higher insurance premiums and lay offs are probative economic effects.

16

One factor a jury may consider when determining whether and to what extent a punitive damages award is appropriate in a given case is the defendant's ability to fund any such award. Accordingly, the Court concludes the law allows defendants to present witnesses to provide testimony that, if a particular punitive damages award is given, there would be a negative economic effect on the defendants, including the effects to which Ruth objects. Thus, the motion is **DENIED**. The Court adds, however, that it will limit any such testimony to ensure there are no unnecessary or unsupported appeals to sympathy.

- **Ruth's Motion to Exclude Hobart Witness Russ McClellan (*Ruth* docket no. 162).**

Pursuant to Fed. R. Civ. P. 30(b)(6), Hobart designated Eugene Sabel as its witness to discuss, among other topics, "Hobart's communications with Ingalls [Shipyard] re: Hobart welding products and their health effects." When asked at his deposition what Hobart had told Ingalls regarding the health effects of manganese in welding fumes, Sabel answered: "I'm not aware of anything that I told them and I'm not aware of anything that anybody else in our company has told them at this point." Sabel repeatedly confirmed his belief that neither he nor any other Hobart employee communicated anything to Ingalls about the health effects of manganese in welding fumes. Separately, Ingalls' Fed. R. Civ. P. 30(b)(6) designee, Winston Howell, testified that Sabel was Hobart's contact person with Ingalls, and no one else from Hobart would have communicated with Ingalls about Hobart products. Ruth asserts this testimony, taken together, proves Hobart did not give Ingalls at least some of what a learned intermediary needs to be "learned" about the hazards of welding fumes.

In its most recent witness list, however, Hobart did not list Sabel; instead, Hobart listed Russ McClellan as the witness who would testify about "the availability of safety information and communications with Ingalls." While Sabel was Hobart's contact person with Ingalls before 1997,

17

McClellan was Hobart's contact person with Ingalls some time thereafter.  Ruth argues this tactic is unfair and inappropriate, and he cites case law where "replacement" or "additional" 30(b)(6) witnesses have been precluded from testifying.  Ruth also argues that being forced to impeach McClellan with Sabel's deposition will be confusing to the jury.

Hobart agrees with Ruth that it is bound by Sabel's testimony, but Hobart asserts that "being bound" is not tantamount to a judicial admission – Hobart argues it can still call another witness who may testify differently than did Sabel.  Hobart also disagrees that a jury will be unduly confused.  Because the Court agrees with Hobart, Ruth's motion is **DENIED**.  Generally, testimony from a 30(b)(6) witness can be contradicted or used for impeachment at trial, just like any other deposition testimony; it is only when a party first provides a *non-responsive* 30(b)(6) deponent and later tries to call a more-responsive witness at trial that courts have excluded the witness.  Accordingly, Hobart may call McClellan at trial, with the understanding that Ruth may: (1) proffer Sabel's deposition testimony in Ruth's case-in-chief; (2) adduce the fact that McClellan was not designated until after Sabel had testified; and (3) use Sabel's testimony for any other relevant purpose (including impeachment of McClellan).

• **Ruth's Motion to Exclude Evidence Re: Employers' HazCom Duties (*Ruth* docket no. 164).**

With this motion, Ruth challenges certain testimony defendants seek to elicit from their Industrial Hygiene experts regarding the Hazard Communication Standard ("HazCom"), 29 C.F.R. §1910.1200, which was promulgated by the Occupational Safety and Health Administration ("OSHA").  Ruth states the defendants' experts intend to discuss the duties, under HazCom, of employers to convey warnings to employees, and will then "opine or insinuate" that Ingalls "complied with the provisions of OSHA or HazCom."  Specifically: "Defendants intend to have experts Chute, Boelter, and Krenek read portions

18

of OSHA and HazCom to the jury and then testify to the jury: (1) what *they* think these regulations mean; (2) what *they* think Ingalls' obligations under the regulations are; and (3) whether *they* think Ingalls complied with those regulations." Motion at 3 (emphasis in original). Ruth argues this is inappropriate because: (1) testimony explaining how a statute or regulation works and what it means invades the province of the Court; (2) testimony opining that Ingalls complied with its legal duties under HazCom invades the province of the jury; and (3) such testimony is wholly irrelevant anyway, because the manufacturer's duties to Ruth are separate from Ingalls' duties to its employees.

In response, defendants argue that what the employers' duties are under HazCom, and whether Ingalls met those duties, is highly relevant. Defendants assert that the question of what warnings were required depends on all the circumstances of the product user and his environment, and those circumstances necessarily include what the manufacturer could reasonably expect an employer to tell its employees, as required under HazCom. For example, defendants note their warnings refer employers of welders, as well as welding rod users, to OSHA regulations and the MSDSs required under HazCom, "incorporating them by reference." Defendants also note that the "adequate ventilation" referred to in their warnings is necessarily provided by the employer, not the manufacturer, and the OSHA regulations make this clear.

The Court concludes Ruth's motion to exclude evidence of employers' duties under HazCom must be **DENIED**, but adds certain caveats. Testimony regarding HazCom requirements, and Ingalls' efforts to comply therewith, is relevant to many issues in this case, including the learned intermediary doctrine, what "all the circumstances" were surrounding the product's purchase and use, and (at least in Mississippi) comparative fault. A central question in this case is whether defendants acted reasonably in determining what warnings they needed to supply to the ultimate users of their welding rod products,

19

knowing that the HazCom regulation existed and that employers also had certain related duties. Accordingly, defendants' experts may testify about *the defendants' understanding* of what HazCom required and how the defendants endeavored to meet those requirements.  The Court will be careful, however, to exclude any "ultimate conclusion testimony" opining whether a defendant did meet any given legal requirement.  Further, the Court will strictly limit any expert's attempt to explain the meaning of any terms or provisions in any statute or regulation.  Ruth will have to object, if appropriate, to any such testimony on a question-by-question basis.

• **Plaintiffs' Motion to Exclude the Testimony of Laurence Fechter and Brian Buckley (MDL docket no. 966).**

Various experts for both plaintiffs and defendants have addressed the question of whether manganese in welding fumes is "bio-available," meaning whether (and the degree to which) various physiological mechanisms and processes enable the human body to absorb the particular manganese compounds and particle structures contained in welding fumes.  The Court discussed some of this science earlier, in the context of deciding the admissibility of testimony from plaintiffs' expert Jerome Roth.  *See* MDL docket no. 1353 at 20-23.

Plaintiffs now move to exclude the testimony of two of defendants' core experts, Brian Buckley and Laurence Fechter.  To oversimplify somewhat, Buckley's principal opinion is that manganese in welding fumes is not "bio-soluble" in lung fluid; Fechter's principal opinion is that manganese in welding fumes poses no neurotoxicological hazard, because: (1) the various physiological pathways that could allow manganese to reach the brain (including pathways involving lung fluid) do not combine to carry sufficient amounts of manganese to the brain to cause any harm, and (2) the precise form and structure of the manganese compounds that are contained in welding fumes have low bio-availability.

20

Plaintiffs first argue that these opinions do not survive the *Daubert* standard, because the principles and methods the two experts use are not scientifically reliable.[13]  Having read the experts' declarations and the lengthy briefs submitted by both sides, and having heard argument and testimony at the *Daubert* hearing, the Court disagrees with this particular argument.  As to both Buckley and Fechter, their opinions are sufficiently grounded in the scientific method to pass the *Daubert* standard.  Certainly, there are substantial weaknesses in their methodologies that cross-examination can and did expose, and there is much about the conclusions they reach which is questionable in light of the compelling scientific testimony proffered at the hearings; but the Court concludes that: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

For a different reason, however, the Court concludes it is appropriate to exclude the testimony of Buckley.  Buckley testified at length during the Court's *Daubert* hearing and explained the scientific basis for his opinion that manganese contained in welding fume is not soluble in lung fluid, which has a pH of about 7.5.  Buckley further explained that he did not investigate, and/or had no opinion regarding, other physiological mechanisms that might allow manganese in welding fume to move from the lung to the blood stream (such as the role of macrophages in the lungs, or the role of the mucociliary escalator in moving matter from the lungs to the digestive tract).  Buckley also professed no opinion regarding the ultimate bio-availability of manganese contained in welding fumes.  The sum and substance of Buckley's opinion, then, was simply and only that manganese contained in welding fumes is not soluble in lung fluid alone.

---

[13]  Plaintiffs do not argue that either Buckley or Fechter are not sufficiently qualified.

This contention, however, is not at issue – there is no plaintiffs' expert who has opined that absorption of manganese by lung fluid, alone, is a significant pathway leading to manganese in the brain.[14]  Indeed, there appears to be no debate, either in this case or in the relevant scientific field, regarding the correctness of Buckley's ultimate and only conclusion.  Given the length of this trial and the multitude of other scientifically complicated issues, the Court concludes Buckley's testimony would take too much valuable trial time without any beneficial purpose.  The ultimate touchstone governing admissibility of expert testimony is whether it will assist the trier of fact, and the Court concludes Buckley's testimony will not provide substantial assistance.  Buckley's experiments and opinions, though interesting to listen to, are too much ado about nothing that is material, so exclusion is appropriate under Fed. R. Civ. P. 611(a).[15]

The Court further finds, moreover, that Buckley's testimony must also be excluded under Fed. R. Evid. 403.  Spending substantial time analyzing and appearing to debate a non-debatable proposition could mislead the jury into believing that plaintiffs proffer a scientific case which they do not, and which is easily rebutted.  In other words, Buckley's testimony would have the effect of putting up what is no more than a straw man which, because of the scientific complexity of the testimony, the jury could be confused into believing is important.

For the same reasons, the Court concludes that those portions of the opinions of defendants'

---

[14]  Plaintiffs' expert Roth, for example, opines that manganese inhaled into the lung reaches the brain through two different avenues, neither of which involves direct absorption by lung fluid.  *See* MDL docket no. 1353 at 21 n.16.

[15]  Rule 611(a) states that " [t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

expert Fechter and plaintiffs' expert William Longo that rely upon or refer to Buckley's experiments and opinions must also be excluded.  Thus, for example, Longo's testimony about modifying Buckley's experiments by lowering the pH of the synthetic lung fluid is excluded, as it would not be helpful to a jury and does not meaningfully help to resolve any issue in dispute.  Similarly, Fechter need not refer to Buckley's studies to show that only about 1-2% of manganese contained in welding fume is soluble in lung fluid alone; Fechter can merely state the fact, which is undisputed.  These rulings will greatly streamline the presentation of proofs in this case and yet have no material effect on their substance.

For all these reasons, plaintiffs' motion to exclude Buckley is **GRANTED**, and the motion to exclude Fechter is **DENIED**.

•  **Defendants' Motion to Exclude Testimony from Glenn Harrison (MDL docket no. 1373).**

Dr. Glenn Harrison is plaintiffs' MDL core expert on lobbying; he is an Economics Professor who specializes in how government regulation and marketplace economics intertwine.  Harrison's declaration explains that one way economists analyze government regulation is by using supply and demand concepts: politicians supply workplace regulations, workers demand them, and monopolies can arise where the regulated industry "captures" the regulators, so that regulation is somewhat illusory.  This economic theory is decades old and has been applied to many industries, including regulation of the legal bar.[16]  Harrison ultimately opines that the welding industry engaged in "unacceptable lobbying activities" by withholding information from regulators and putting industry cost ahead of worker safety.  In his

---

[16]  The Court, accordingly, concludes that Harrison's testimony passes the *Daubert* standard. Both the principles and methods used by Harrison, as well as his application of those principles and methods to the facts of the case, are sufficiently reliable; and Harrison is sufficiently qualified to offer the opinions he sets out in his declaration.

23

declaration, Harrison explicitly refers to and relies upon the opinions of another plaintiffs' expert, Dr. Hoffman, whom this Court previously ruled could not testify about business ethics. *See* MDL docket no. 1353 at 36-42.

Defendants argue that Harrison's testimony must be excluded for two overriding reasons.[17] First, defendants insist that Harrison's conclusion that the industry engaged in "unacceptable practices" is reminiscent of Hoffman's inadmissible, subjective conclusion that the industry engaged in "unethical practices." Defendants state that, like Hoffman's testimony, Harrison's conclusion is not based on the correct legal standard, ignores their First Amendment rights, usurps the jury's role, and is irrelevant to any issue in the case.

While the Court agrees that Harrison cannot opine that the industry did anything "unacceptable," the Court disagrees that *all* of Harrison's testimony must be excluded. In particular, the Court finds that the following opinions, contained in Harrison's declaration, are generally admissible under *Daubert* and the Federal Rules of Evidence: (1) the welding industry had an economic interest in affecting workplace regulation related to manganese exposure, and also in affecting regulations related to defendants' government contractor defense; (2) different health standards for manganese exposure reflect different trade-offs between worker safety and economic feasibility; (3) the welding industry had an economic incentive to discourage decreases in allowed or recommended manganese exposure levels set by regulators; and (4) the information that the industry chose to give to regulators was affected by economic interests. Further, Harrison can testify generally on how the marketplace and government regulation interact.

_____

[17]    In their motion, defendants actually provide "four arguments" why Harrison's testimony should be excluded, but the first three arguments are all closely related.

In sum, the Court concludes that the motion to exclude Harrison's testimony must be **DENIED**. But Harrison may not rely on the opinions of Hoffman, and may not opine that, in his view, the welding rod industry engaged in "unacceptable" activity.

•     **Defendants' Motion to Exclude Testimony from Dr. Roth (MDL docket no. 972).**

Earlier, this Court addressed the question of whether Dr. Roth was qualified to testify about the mechanisms of human absorption of manganese particles found in welding fume, and the subsequent distribution and effects of those particles in the human body. *See* docket no. 1353 at 20-23 (concluding he was qualified). The defendants have also moved to exclude Dr. Roth's opinions under *Daubert* on the basis that they are not scientifically reliable. *See* Omnibus Daubert Motion (docket no. 972.1) at 35 *et seq.* In particular, defendants assert there is no reliable scientific evidence to support Dr. Roth's (or any other expert's) opinions "(1) that manganese contained in welding fume can enter the brain through the olfactory system, (2) that manganese from welding fume is solubilized and made bioavailable by macrophage, (3) that manganese from welding fume is transported across cells that line the lung, and (4) that the Divalent Metal Transporter ("DMT") plays any role in the transport of manganese across the blood-blain barrier." *Id.* at 36. *See* docket no. 1353 at 21 n.16 (summarizing Dr. Roth's discussion of various physiological mechanisms that allegedly transport manganese particles in welding fumes to the brain).

Having reviewed the parties' arguments and evidence, the Court concludes this motion must be **DENIED**. With regard to Dr. Roth's opinion that manganese particles contained in welding fumes are solubilized in the lung by macrophage lysosomes, thus becoming bio-available, defendants' own experts conceded that macrophages can solubilize manganese; the true debate is the *extent* to which

25

solubilization occurs, and whether and how any solubilized manganese particles reach the brain. As to this latter question, at least some of defendants' own experts, again, conceded that manganese does pass from the lung to the blood stream somehow, that manganese does cross the blood/brain barrier somehow, and that manganese does deposit in certain areas of the brain somehow – even though defendants insist the *precise* mechanisms proposed by Dr. Roth are not scientifically reliable explanations of how all of these things occur. While defendants' challenges to Dr. Roth's explanations certainly highlight gaps in current medical understanding, the Court concludes that Dr. Roth's opinions are not so untethered from the scientific method and from reliably collected data that his opinions are inadmissible under *Daubert*.[18]

The Court adds that the question of admissibility is closer with respect to certain parts of Dr. Roth's opinions than others. For example, the Court is confident that the dictates of *Daubert* do not call for exclusion of Dr. Roth's opinions and explanations regarding macrophages, DMT, and the mucociliary escalator. As noted above, while defendants can debate the niceties regarding how manganese from welding fumes enters the brain once it is in the lungs, that debate is at the margins – there is substantial scientific support for the proposition that it does so. A closer question is presented regarding Dr. Roth's opinions and explanations related to the "olfactory pathway," where he contends that manganese particles in welding fumes also obtain relatively direct entry to the brain through the nasal cavity and olfactory system. Virtually all of his opinion testimony on this issue is based on rat and other animal studies, and

---

[18] *See Daubert*, 509 U.S. at 590 ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science."); *In re: Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 289 F.Supp.2d 1230, 1247 (W.D. Wash. 2003) ("The fact that the mechanism remains unclear does not call the reliability of the opinion into question: 'Not knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim. Causation can be proved even when we don't know precisely how the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage somehow.'") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1995) ("*Daubert II*")).

defendants correctly criticize extrapolation to humans from these animal studies, because the olfactory pathways of rats and humans have dissimilar physiological structures.  The Court ultimately concludes, however, that admission of this testimony is appropriate.  Defendants' own experts, including Drs. Fechter and Olanow and others, themselves rely on animal studies to test or prove certain theses regarding human physiology.  Accordingly, Dr. Roth will be permitted to testify about the olfactory pathway, and defendants will be allowed wide latitude on cross-examination to challenge whether the animal studies and other facts upon which Dr. Roth relies are sufficient to support his opinions.

•       **Defendants' Motion to Exclude Testimony Regarding the "Welding Fume Study" (MDL docket no. 972.2).**

Earlier, this Court addressed the question of whether Mr. Ewing and Dr. Zimmerman were qualified to testify about medical causation and toxicology.  *See* docket no. 1353 at 18-20 (concluding they were qualified).  The defendants have also moved to exclude testimony from these two Industrial Hygienists regarding an experiment they helped to conduct known as the "Welding Fume Study."[19]  The Welding Fume Study was designed to, among other things, "quantify personal breathing zone welding fume and manganese exposures for welders and their potential helpers when performing Shielded Metal Arc Welding (SMAW) in confined spaces, with varying amounts of general dilution ventilation."  Motion at 75.  In particular, a room-sized test chamber of known dimensions was created, inside of which a welder was engaged to practice his trade using different types of welding rods.  The ventilation rate to the chamber was manipulated and measured, and air samples were collected from under the welder's

---

[19]   At the time defendants filed their motion, the Welding Fume Study had not been published, but it since has been.  *See* Michael Harris, *et al., Manganese Exposures During Shielded Metal Arc Welding (SMAW) in and Enclosed Space,* J. of Occupational and Environmental Hygiene 375 (Aug. 2005).

mask, near his shoulder outside of his mask, and in various spots throughout the chamber (both upstream and downstream from the ventilation flow around the welder).  The samples were then evaluated for welding fume and manganese particle levels.  Ultimately, manganese levels in all of these locations were assessed for five different ventilation rates, for each of three different welding rods.

Defendants object to the admissibility of any testimony regarding the Welding Fume Study, arguing that the Study is not scientifically reliable.  Defendants point out, for example, that: (1) the Study has not been replicated by Ewing or Zimmerman or anybody else; (2) the measurements taken in the Study did not involve repeat sampling; (3) the room-size and ventilation conditions chosen in the Study did not duplicate any actual conditions for any known welder; and (4) the Study did not examine or attempt to replicate other known variables that affect airborne manganese levels, such as the voltage of the welding machine, the welder's work position, and so on.  Defendants also assert that the Welding Fume Study was funded by plaintiffs' counsel and conducted solely for purposes of this litigation. Defendants argue that all of these criticisms illustrate that the Study is not admissible under *Daubert*.

While defendants certainly expose weaknesses and limitations inherent in the Welding Fume Study, the Court concludes these circumstances do not require the Study to be completely excluded from evidence.  Plaintiffs explain they do not intend to suggest that their Welding Fume Study actually mimics the conditions a particular welder experienced, or accurately quantifies the historical exposure to welding fumes or manganese particles that a particular welder sustained.  Rather, the Welding Fume Study merely provides a reference point against which a particular welder's circumstances may be compared.  Thus, if a welder testifies he welded mostly outside, using low-fume welding rods, there is a reasonable basis for an expert to opine that the manganese levels measured in the air samples in the Welding Fume Study were probably higher than those the welder experienced; conversely, if the welder worked inside of very

small, enclosed spaces with little airflow, using a high-fume product, an expert has a basis to opine that the manganese levels measured in the air samples in the Welding Fume Study were probably lower than those the welder experienced.

Plaintiffs explain that the Welding Fume Study is simply one data point, or reference point, that their experts might use to establish historical exposure. Other relevant information to establish historical exposure would include the welder's explanation of his own working conditions, any air sampling done in the welder's workplace, the OSHA welding sample database, other data available from the welder's employer and Workers' Compensation insurance carrier, measurements from other fume studies by NIOSH, and AWS standardized procedures for estimating welding fume exposure levels. Even if all of these data and protocols can serve as a basis only to show that the welder was likely exposed to "more than" a certain level of manganese particles – as opposed to definitely exposed to an exact, known level of manganese particles – this information is normally relevant and admissible. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 671 (5th Cir. 1999) (reversing exclusion of expert opinion where the expert witness was able to conclude only that the plaintiffs were "exposed to benzene at levels several hundred times the permissible exposure level," because "the law does not require Plaintiffs to show the precise level of benzene to which they were exposed").

In sum, the methodology of the Welding Fume Study is sufficiently empirical, reliable, and scientific to survive the *Daubert* standard, given the comparative purpose for which plaintiffs seek to offer it. Further, defendants are fully capable of revealing to a jury the limitations which they believe make any referential comparisons to the Welding Fume Study nugatory. Finally, the Court notes that its decision on this issue is also informed by having reviewed other motions and documents in this case which make clear that defendants' own experts (e.g., Drs. Fechter and Olanow) use mechanisms and data

29

to calculate historical estimates of welding fume exposure that are no more precise than the Welding

Fume Study.  Accordingly, the motion to exclude testimony relating to the Welding Fume Study is

**DENIED**.[20]


•　**Defendants' Motion to Exclude Causation Testimony (MDL docket no. 972.2).**

As have been most of defendants' evidentiary motions, the defendants' motion to exclude

testimony of causation ("Causation Motion") was in part a motion *in limine*, and in part a motion for

summary judgment.  The *in limine* aspects of the Causation Motion were directed mostly at exclusion

of testimony from expert witnesses who opined about physiological mechanisms that allegedly allow

manganese particles in welding fumes to cause permanent brain damage.  Elsewhere in this and other

opinions, the Court has addressed these *in limine* contentions.

The summary judgment aspect of the Causation Motion is very similar to issues raised by the

defendants earlier in their "PD Motion."  As defendants explain:

> Defendants previously-filed [PD Motion] discusses the absence of a causal link between
> Parkinson's Disease and exposure to <u>any</u> form of manganese. [The Causation Motion] is
> focused on a similar lack of scientific evidence linking any other form of movement
> disorder and exposure to the manganese contained in low manganese mild and stainless

---

[20]  The Court holds here only that the Welding Fume Study is admissible, and that defendants'
arguments go to the weight a jury should give the Study, not its admissibility.  Whether the Welding
Fume Study evidence, combined with any other evidence, satisfies a given plaintiff's required quantum
of proof of exposure is, of course, a separate issue.

With regard to proof of exposure levels, defendants identify a number of weaknesses in plaintiffs'
experts' explanations of how they intend to quantify a given welder's historical exposure.  But the Court
cannot conclude, in the abstract, that these explanations are inadmissible in every MDL case as a matter
of law.  Further, it appears an expert's methodology may be admissible to support an opinion that a
welder's exposure must have *exceeded* a certain level (either in total or during certain moments in time),
even though the same methodology might not support an opinion that the welder's exposure was a
certain, known quantity.

steel welding fume.

Causation memorandum at 3 n.1 (emphasis in original).  Given this similarity in focus and the Court's prior rulings, the Causation Motion may now be ruled upon summarily.

Defendants filed their Causation Motion before the Court issued its opinion finding that the PD Motion was not well-taken.  *See* docket no. 1353.  Obviously, there is an overlap of issues addressed in the PD Motion and the Causation Motion; indeed, many of the same arguments and same citations to cases and medical studies appear in each.  The overriding theme of the Causation Motion is that plaintiffs do not have sufficient epidemiological or other evidence to prove general causation.

The Court believes reference to its Order denying the PD Motion, and to its discussion in this opinion of Dr. Roth's testimony, sufficiently answers the questions posed by defendants' summary judgment arguments on this issue.  Put simply, for the same reasons stated earlier, and based on a careful assessment of the scientific data submitted by the parties regarding the movement of manganese into and through the human body, the Court concludes the Causation Motion must be **DENIED**.  The evidence so far presented is sufficiently reliable to support the assertion that exposure to low-manganese welding fumes can cause, contribute to, or accelerate a movement disorder, including a parkinsonian syndrome that some doctors will diagnose as PD.

**IT IS SO ORDERED.**

**/s/ Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:** February 27, 2006

31